



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| RYAN SCOTT BARNETT | § | CASE NO. **3-24CV2425-E** |
| | § | |
| Plaintiff, | § | COMPLAINT |
| | § | |
| v. | § | 1. VIOLATION OF CIVIL RIGHTS |
| | § | 42 U.S.C. §§ 1983 (Fourth Amendment) |
| CITY OF DALLAS, | § | 2. VIOLATION OF CIVIL RIGHTS |
| EDGARDO GARCIA, | § | 42 U.S.C. §§ 1983 (Sixth Amendment) |
| ISRAEL HERRERA, | § | 3. VIOLATION OF CIVIL RIGHTS |
| YDALIS MONTES CARREON, | § | 42 U.S.C. §§ 1983 (Eighth Amendment) |
| LUIS CARDENAS, | § | 4. VIOLATION OF CIVIL RIGHTS |
| PATRICK BEARDEN-HICKS, | § | 42 U.S.C. §§ 1983 (Fourteenth Amendment) |
| GIOVANNI AVILA, | § | 5. VIOLATION OF CIVIL RIGHTS |
| RUBEN LOZANO, | § | 42 U.S.C. §§ 1983 (Fifth Amendment) |
| LELAND LIMBAUGH, | § | 6. VIOLATION OF CIVIL RIGHTS |
| CHEVRON BROWN, | § | 42 U.S.C. §§ 1983 (Conspiracy) |
| EDWARD TENA, | § | 7. VIOLATION OF CIVIL RIGHTS |
| and DOES 1 through NN, | § | 42 U.S.C. §§ 1983 (Municipal Liability— |
| | § | *Monell*) |
| Defendants. | § | |
| | § | |
| | § | |
| | § | JURY DEMAND |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
## PURSUANT TO 42 U.S.C. § 1983 (non-prisoner)

**PLAINTIF ALLEGES AS FOLLOWS:**

This is a complaint for damages based upon federal civil rights and state constitutional rights violations committed by the Defendant City of Dallas and its respective officials, uniformed peace officers, employees, and /or agents. This case is brought pursuant to 42 U.S.C. §§ 1983, 1988 and Texas state law. Federal jurisdiction is based upon 28 U.S.C. §§ 1331, 1343 (a)(1-4).

## JURISDICTION

1. Plaintiff brings this case pursuant to 42 U.S.C. §§ 1983, 1988 and Texas state law. Federal jurisdiction is based upon 28 U.S.C. §§ 1331, 1343 (a)(1-4). Supplemental jurisdiction exists over the state claims and Defendants pursuant to 28 U.S.C. §§ 1367.

## VENUE

2. The claims alleged herein arose from events or omissions that occurred in the City of Dallas, Dallas County, Texas. Therefore, venue lies in the Northern District of Texas pursuant to 28 U.S.C. Section 1391 (b)(2).

## PARTIES

### *Plaintiff*

3. Plaintiff RYAN SCOTT BARNETT ("Mr. Barnett") was a resident living at 10785 Coogan Dr., Dallas, Dallas County, Texas, 75229 and a private citizen of the State of Texas at all times material to this Complaint.

### *Defendants*

4. Plaintiff is informed, believes, and thereupon alleges that Defendant EDGARDO (EDDIE) GARCIA ("Defendant Garcia") was at all times material herein a policy maker, decision maker, and/or supervisor and acting under color of law within the course and scope of his employment as the Chief of Police of the City of Dallas Police Department ("DPD"), 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

5. Plaintiff is informed, believes, and thereupon alleges that Defendant ISRAEL HERRERA ("Defendant Herrea") was at all times material herein a policy maker, decision maker, and/or supervisor and acting under color of law within the course and scope of his employment as a Deputy Chief of Police of DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

6. Plaintiff is informed, believes, and thereupon alleges that Defendant YDALIS MONTES CARREON #12072 ("Defendant Montes Carreon") was at all times material herein acting under color of law within the course and scope of her employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. She is being sued individually and in her official capacity.

7.  Plaintiff is informed, believes, and thereupon alleges that Defendant LUIS CARDENAS #11162 ("Defendant Cardenas") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

8.  Plaintiff is informed, believes, and thereupon alleges that Defendant PATRICK BEARDEN-HICKS #11288 ("Defendant Bearden-Hicks") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

9.  Plaintiff is informed, believes, and thereupon alleges that Defendant GIOVANNI AVILA #12071 ("Defendant Avila") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

10. Plaintiff is informed, believes, and thereupon alleges that Defendant RUEBEN LOZANO #9732 ("Defendant Lozano") was at all times a decision maker, and/or supervisor and material herein acting under color of law within the course and scope of his employment and office as a supervising Sergeant law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

11. Plaintiff is informed, believes, and thereupon alleges that Defendant CHEVRON BROWN #12305 ("Defendant Brown") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

12. Plaintiff is informed, believes, and thereupon alleges that Defendant LELAND LIMBAUGH #10051 ("Defendant Limbaugh") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

13. Plaintiff is informed, believes, and thereupon alleges that Defendant EDWARD TENA #8444 ("Defendant Tena") was at all times a decision maker, specialized investigator, and/or supervisor and material herein acting under color of law within the course and scope of his employment and office serving in the narcotics division as a Sergeant law enforcement officer of the DPD, 1400 Botham Jean Blvd., Dallas, Dallas County, Texas 75215. He is being sued individually and in his official capacity.

14.   Plaintiff is informed, believes, and thereupon alleges that Defendant CITY OF DALLAS ("Defendant City") is a duly constituted governmental entity in the State of Texas, and is, or was, the employer of all individually named Defendants including, but not limited to, those who are sued in their individual and official capacities, as well as one, or all, of Defendant DOES 1 through NN.

15.   The identities, capacities, and/or nature of involvement of Defendant DOES 1 through NN ("Doe Defendants") are presently unknown to Plaintiff. Plaintiff therefore sues such persons using "Does" as fictitiously named defendants. Plaintiff is informed, believes, and thereupon alleges that there is likely to be evidentiary support to prove that each Doe Defendant was involved in some manner and legally responsible for the acts, omissions, and/or breaches of duty alleged below. Plaintiff will amend the Complaint to name the Doe Defendants upon learning their true identities and roles in the actions complained herein.

16.   All of the facts, acts, omissions, events, and circumstances herein mentioned and described occurred in the City of Dallas, State of Texas, and the corporate and/or entity Defendants, and each of them, are residents of the City of Dallas, State of Texas, and/or have their principal place of business in said City and State, and/or are doing business in said County and State.

17.   Plaintiff is informed, believes, and thereupon alleges that all Defendants employed by Defendant City were, at all times relevant and material to this Complaint, acting within the scope of their employment duties for Defendant City, and under color of law. Plaintiff is informed, believes, and thereupon alleges that each of the individual Defendants' acts were known to, discovered by, approved by, and/or ratified by Defendant City, by and through their policy makers, decision makers, officials, officers, and/or supervisors, including Defendant Garcia, Defendant Herrera, and applicable Doe Defendants.

18.   Plaintiff is informed, believes, and thereupon alleges that at all times herein mentioned, each of the Defendants–including officials, supervisors, watch commanders, and other policymakers from Defendant City and /or Doe Defendants and their agents-was the agent, employee, or co-conspirator of one other, some, or all of their Co-Defendants. Plaintiff is informed, believes, and thereupon alleges that each of the Defendants, acting individually and/or in concert with each other, engaged in a common plan to wrongfully deprive Plaintiff of his respective rights to privacy, freedom of expression, security in person and effects, freedom from unreasonable searches and seizures, and due process of law, among others described herein. Each and all of the things done by each Defendant against Plaintiff, as mentioned in this entire Complaint, were done, partially if not entirely, because of Plaintiff's refusal to submit to intimidation and their desire to cater to the special interests of KWPF. In doing each and all of the things herein mentioned, or neglecting or intentionally failing to

rectify said misconduct, each and all Defendants were acting pursuant to a *de facto* policy and within the scope of such agency, employment, and conspiracy and with full permission, knowledge, approval, ratification, and support of each other.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### *Consumable Hemp, Licenses, and Permits*

19. "The [United States] 2018 Farm Bill legalized the commercial production of hemp and authorized states to submit state plans to administer hemp programs. Here in Texas, House Bill (HB) 1325 was signed into law in June 2019 and authorizes the production, manufacture, retail sale, and inspection of industrial hemp crops and products. This also includes products for consumable hemp products which contain cannabidiol (CBD), as well as other edible parts of the hemp plant. The Texas Department of Agriculture opened the hemp licensing and permit application process online on March 16, 2020"[1]

20. "In accordance with HB 1325, Texas Health and Safety Code (HSC) Chapter 443, and HSC Chapter 431, Texas firms can manufacture CHPs [Consumable Hemp Products] such as food, drugs, cosmetics and devices containing "hemp or one or more hemp-derived cannabinoids, including cannabidiol." The products must be properly tested, packaged and labeled per HSC 443 and 25 Texas Administrative Code 300. The firms must obtain the Texas Department of Health and Human Services ("DSHS") Consumable Hemp Product License before operation.

    Products that contain hemp ingredients on the U.S. Food and Drug Administration's Generally Recognized as Safe (GRAS) list - hulled hemp seeds, hemp seed protein, and hemp seed oil - are not considered CHPs in Texas. Manufacturers of such products must obtain the DSHS Food Manufacturer License."[2]

21. HB 1325 required DSHS to:

    i.   Establish a manufacturing licensure program for Consumable Hemp Products ("CHP") – "A Consumable Hemp Product License is required to make any change to a consumable hemp product or its packaging and to sell it wholesale or retail. Any change can be repackaging hemp

---

[1] Texas Industrial Hemp Program / Texas Department of Agriculture Website
(https://texasagriculture.gov/Regulatory-Programs/Hemp)
[2] Consumable Hemp Products Frequently Asked Questions / Texas Department of Health and Human Services
Website (https://dshs.texas.gov/consumable-hemp-program/consumable-hemp-products-frequently-asked-questions)

flower from bulk into smaller packages, relabeling a bottle of CBD oil, adding your own label to a package of CBD gummies, or adding CBD oil to cupcakes."[3]

    ii.    Create a registration process for retailers selling CHPs containing cannabidiol ("CBD") – "If consumable hemp products (CHPs) are only going be sold in retail and no changes will be made to the CHPs or its packaging, an applicant will need to complete the Texas Department of State Health Services (DSHS) Hemp Retail Registration."[4]

    iii.    Work with the Texas Department of Public Safety ("DPS") on random testing for CHPs containing CBD sold at retail.[5] – Texas Health and Safety Code, Title 6., Chapter 443. Subchapter D. provides for Testing of Consumable Hemp Products

22.    Consumable hemp products must meet the testing, packaging, and labeling requirements of § 443 Texas Health and Safety Code.

23.    Packaging and labeling must meet all the requirements of 25 Texas Administrative Code § 300.402 in addition to the requirements of 25 Texas Administrative Code § 300.102.

24.    Mr. Barnett is the owner operator of Elev8ted Foods, LLC, a Texas limited liability company, that manufactures and sells consumable hemp products. Mr. Barnett obtained his Consumable Hemp Product License #684 on May 19, 2022.

25.    All products produced or sold by Mr. Barnett meet the testing, packaging, and labeling requirements of § 443 Texas Health and Safety Code, all packaging requirements as defined in 25 Texas Administrative Code §300.402, and the requirements of 25 Texas Administrative Code §300.102.

26.    Mr. Barnett informed all Defendant Officers of his status as a Consumable Hemp Product Licensee. He further provided a simplified description of what it meant and what it allowed him to do.

27.    There is no minimum age requirement set by Texas statute to purchase consumable hemp products in Texas. This includes hemp products that are intended for smoking. Mr. Barnett chooses to only sell to individuals over the age of 21 years.

28.    Mr. Barnett has signage advertising $5 Joints as he chooses to use the common name for cannabis pre-rolls as a marketing tool. His marketing pieces often incorporate slang and images depicting marijuana use in the 60s, 70s, and 80s. He also uses the slogan "Legalize Y'all" as he advocates for the full use and legalization of all cannabinoids. At the same time he is a big proponent of following

---

[3] Ibid.
[4] Ibid.
[5] Ibid.

the rules to the letter as to what he offers for sale and is quick to advise that the products are as labeled a consumable hemp product that is in compliance with 7 U.S.C. Chapter 38, Subchapter VII, or has a delta-9 tetrahydrocannabinol concentration of less than 0.3 percent.

29.    Elev8ted Foods owns and operates a Class I non-motorized mobile food unit [cart] under City of Dallas permit number C1-8874. A Class I mobile food unit is a mobile food unit from which only the following foods and beverages are served, sold, or distributed: (A) Food that is prewrapped, bottled, or otherwise labeled and packaged in individual servings. (B) Beverages that are not time/temperature controlled for safety and are not dispensed from covered urns or other protected equipment. (C) Raw, uncut vegetables and fruits.

30.    The City of Dallas issues a permit label that must be placed on the mobile food unit. The label on Mr. Barnett's cart can be found on the front side of the cart. Additionally, while not required by ordinance or policy, Mr. Barnett also keeps paper documents related to the permit on the cart.

31.    All products sold by Elev8ted Foods, and Mr. Barnett by extension, from the mobile food unit meet all requirements as defined for a Class I mobile food unit.

### Bridge Structure Designated as Klyde Warren Park, Public Easements and Right-of-Ways,

32.    The City of Dallas constructed an expansive bridge structure to create a green space "out of thin air," connecting Dallas' Uptown neighborhood on the north side of Texas State Highway Spur 366, also named and known as Woodall Rogers Fwy ("Spur 366" or "Woodall Rogers") with the Arts District and downtown business center on the south side of Woodall Rogers[6]. Traffic on Woodall Rogers travels under the structure in what is now perceived to be a tunnel; however, it is actually an expansive bridge across the airspace of the freeway. The green space was named Klyde Warren Park ("KWP") (The space was named for the then minor child of the biggest private donor to the project.)

33.    KWP is bounded on the east by the N. Pearl St. bridge, the west by the N. St. Paul St. bridge, the north by the north to south Woodall Rogers Fwy feeder road, and the south by the south to north Woodall Rogers Fwy feeder road. Additionally, Olive St., an existing roadway/bridge, was incorporated into the structure and dissects the green space into two separate areas. Because Klyde Warren Park spans the airspace directly above Woodall Rogers it is further identified as being located at 2012 Woodall Rodgers Fwy.

34.    Spur 366/Woodall Rogers and the airspace above it is owned and managed by the Texas Department of Transportation ("TxDOT"). The bridges connecting the north and south sides of Olive St., N. Pearl

---

[6] https://www.klydewarrenpark.org/our-story

St., N. and St. Paul St. are owned and maintained by the City of Dallas as normal streets within the city via an agreement with TxDOT to span their airspace. The bridge structure that Klyde Warren Park is located on is owned by the City of Dallas and was also built via an agreement with TxDOT to use their airspace.

35. The City of Dallas has contracted with the Klyde Warren Park Foundation ("KWPF"), a Texas non-profit organization, to manage and maintain the park space on the structure. The contract between City of Dallas and Klyde Warren Park only encompasses the grounds area and the use of designated food truck spaces – it does not remove the public right-of-ways such as Olive St. and its associated pedestrian sidewalk.

36. A public right-of-way is any public thoroughfare such as a street, road or alley. It usually includes the median, utility poles, sidewalks and the area immediately adjacent to the street. The City of Dallas has several ordinances that define the width of the easements, and the requirements and width of sidewalks based on street size and use as well as the 2021 Sidewalk Master Plan that was developed to strengthen a multi-modal transportation plan for the city.

37. The City of Dallas Property Records Department maintains maps of all property, easements, and right-aways within the city limits. The recorded maps for KWP indicate that the abutting and dissecting streets (Pearl, St. Paul, and Olive) and their adjoining sidewalks remain as public easements and were not ceded to the management control of KWPF when the project was completed. This is further indicated by the dividing structure/features especially noticeable on Olive Street that separate the green space area of KWP from the sidewalk and vehicle traffic.

38. An open records request failed to produce any contract, memorandum, or waiver from the City of Dallas to KWPF that negated the easements. Furthermore, no contract, memorandum, or waiver between TxDOT and the City of Dallas was found to cede control to KWPF either.

39. KWPF does have control to allow or deny Mobile Food Truck providers in the designated food truck space parking along the south perimeter of the space from N St. Paul to Olive St. This is due to requirements that Mobile Food Trucks have permission for available bathroom facilities within a specific range. KWPF does not have control of the sidewalks and their use by pedestrians or Non-Motorized Class I Mobile Food Units on the easement.

### *August 12, 2023, The Search and Detention of Plaintiff*

40. On or about August 12, 2023, on the south side of the public sidewalk of Olive Street, Dallas, Dallas County, Texas, Mr. Barnett was selling legally compliant sealed prepackaged consumable hemp

products (prerolled joints, gummies, vaping devices and cartridges, cannabis waters, THCa diamond powder, THCa flower, and other related products and accessories) as allowed by his Consumable Hemp Product License #684 from his City of Dallas permitted mobile food unit/cart.

41.   Mr. Barnett remained in the right-of-way – he was never within the boundaries of Klyde Warren Park grounds.

42.   David Hutzler, who identified himself as the park manager of Klyde Warren Park, as well as multiple park security guards demanded that Mr. Barnett leave the "park". When Mr. Barnett refused to cede his right to sell as permitted on the right-of-way, Mr. Hutzler summoned DPD. Mr. Barnett was later to learn that Mr. Hutzler also personally contacted Defendant Deputy Chief Israel Herrera.

43.   Defendants Montes Carreon, Cardenas, Bearden-Hicks, Avila, Lorenzo, Brown, and Limbaugh all arrived on the scene ("Defendant Officers" as a group).

44.   Mr. Barnett was detained by Defendants Montes Carreon and Cardenas for some time. Mr. Barnett answered questions about the right-of-way and agreed that KWPF had the right to control the Food Trucks as well as any vendors or food establishments inside the KWP boundaries. He did not agree that the right-of way belonged to them also.

45.   Mr. Barnett informed all Defendant Officers of his status as a Consumable Hemp Product Licensee. He further provided a simplified description of what it meant and what it allowed him to do.

46.    Mr. Barnett informed and showed Defendant Officers his Class I Mobile Unit permit. He further restated for them what it allowed him to do and why it was different from the Food Truck Class Permits that KWPF was able to approve (or not).

47.   Mr. Barnett offered to accept KWPFs claim to the right-of-way, if they could produce a document or map that showed it. Later, Defendant Cardenas stated to the other Defendant officers that he had been shown proof of KWPFs claim. Defendant Cardenas did not provide any evidence however, or document what he was shown in a report of the incident, and there is no body camera footage to support his statement. Mr. Barnett asserts this was a blatant lie intended to support the outcome Defendant Cardenas knew was expected by Deputy Chief Herrara and Defendant Cardenas' unnamed Lieutenant, both of whom, Mr. Hutzler had contacted for special treatment related to his position and personal access based on a statement by Defendant Cardenas to the other Defendants and recorded on his body camera.

48.   Mr. Barnett questioned the Defendants about whether he was being detained and asked that they articulate the criminal activity he was suspected of for them to maintain their stop. Defendant Montes

Carreon made some comments related to them investigating the situation and that maybe there might be a possible criminal trespass. No elements of criminal trespass existed at that time. There were no signs marking the property as private, especially since it was a public easement into a public facility and space owned by the City of Dallas.

49.  At one point, Mr. Barnett mentioned that this was apparently a "Terry Stop". Defendant Cardenas with his back to Mr. Barnett muttered to other officers that he [Mr. Barnett] was probably correct, however, Defendant Cardenas did nothing to correct the situation nor did any of the other Defendant Officers he was speaking with.

50.  Defendant Cardenas also refused to articulate the suspected criminal activity, when asked by Mr. Barnett, by continuously stating that it had already been provided by Defendant Montes Carreon. Mr. Barnett believes and therefore alleges Defendant Cardenas could not respond because there was no articulable suspected criminal activity to base the stop on and that the "investigation" was actually just a fishing expedition.

51.  During one of the many huddles between Defendant Officers, they were advised that Mr. Barnett had a traffic warrant outstanding in University Park. University Park police later advised Mr. Barnett that it was not posted as a "jailable" warrant and that he should just have been made aware of it so he could take care of it as soon as possible. However, Defendant Officers decided to use it as a means to arrest Mr. Barnett and search his belongings when they had no other legal means or standing.

52.  Defendant Officers conspired to create a plan that allowed KWPF to state they wanted Mr. Barnett to be leave and then Defendant Officers would act like if Mr. Barnett agreed he would be given the opportunity to leave freely; however, they fully intended to arrest him either way for the warrant.

53.  Defendants Montes Carreon, Cardenas, Bearden-Hicks, Avila, Lorenzo, Brown, and Limbaugh as indicated on body cam footage conspired to intimidate Mr. Barnett by allowing Mr. Hutzler to claim ownership of the easement and to set up his criminal trespass from property he did not control.

54.  After Mr. Hutzler proclaimed his false ownership, Mr. Barnett was asked if he understood. Mr. Barnett stated that he was on the public easement and had not entered KWP. Officer Montes Carreon in an aggressive and exasperated action indicating her frustration with Mr. Barnett's refusal to just accept her inaccurate and incorrect statement as fact immediately moved around the cart and grabbed Mr. Barnett from behind and handcuffed him. A black male officer, believed to be Defendant Brown, assisted her. Mr. Barnett asked if he was being arrested and Defendant Montes Carreon said yes. When asked for what she and the other officers refused to answer, presumably they needed to get their stories straight. Mr. Barnett was later told he was being arrested for the outstanding warrant in

University Park and Criminal Trespassing. When he arrived at Lew Sterrett Justice Center it changed to Felony Marijana possession.

55. The "Arrest Sheet" indicates the warrant hold; however, University Park was not advised of the hold and therefore did not process it accordingly. This would later result in Mr. Barnett not receiving credit for his over-night stay and time served with University Park.

56. The "Arrest Sheet" does not mention the Criminal Trespass. No criminal trespass citation was issued to Mr. Barnett or filed with the County Criminal Courts as directed by Dallas Police Department General Order 320.03 Criminal Trespass Offenses.

57. All Defendants were aware that Mr. Barnett had a Consumable Hemp Products License. That information was omitted from all reports and records.

58. After staging the arrest, Defendants Cadenas and Bearden-Hicks proceeded to search and seize Mr. Barnett's mobile food unit and his soft-side cooler with back pack straps.

59. In the front pocket of the cooler, Officer Cadenas found what he labeled as "3 black bags of a green leafy substance that appeared to be marijuana inside". Officer Cadenas conveniently left out the information that the bags were sealed, they were labeled with the appropriate wording and QR code to match the product as THCa consumable hemp. 2 additional "black bags" were located in the mobile unit. These were also sealed and labeled as required following statute.

60. Defendant Bearden-Hicks found "6 flimsy plastic containers that contained a clear substance that appeared to be methamphetamine". Defendant Bearden-Hicks failed to read the label on the products that stated it was THCa Diamonds. THCa diamonds and cannabis diamonds in general are a concentrated form of cannabis that you can smoke or vape. They are called diamonds because of their appearance (and purity), with solid crystalline structures that are semi-transparent.

61. As Defendants Cardenas and Bearden-Hicks were searching through Mr. Barnett's inventory they noted items that they were simply going to destroy. Mr. Barnett was not told that his property would be destroyed nor was he given the opportunity to have these items picked up by a third party.

62. Defendant Bearden-Hicks turned over the intentionally falsely identified "marijuana" and "methamphetamine" to Defendant Avila for onsite testing. Defendant Avila further misrepresented the packaging in an effort to make it look like an illegal operation by describing the packaging as "baggies".

63. Initial testing of the THCa Flower taken from one of the sealed compliance labeled black packages did not yield clear positive results, Defendant Avila solicited advice and decisions from Defendants

Montes Carreon, Cadenas, and Lozano. Defendant Avila persisted until getting a positive result or at least one that eventually Defendant Montes Carreon called positive. Initially, Avila had instructed Defendant Montes Carreon in what would be positive (some type of separation). So, the testing officer who was supposedly qualified could not make a positive decision and allowed a non-qualified officer to make the ruling.

64.    The testing of the THCa Flower is only available on Defendant Avila's body cam. Defendants Montes Carreon, Cadenas, Limbaugh did not record the conference between them all.

65.    Page 3 of the "Arrest Sheet" indicates that Defendant Avila also performed a presumptive field test on "the clear crystal substance" (the sealed package labeled THCa Diamonds) which also tested positive as marijuana but did not test positive for as the methamphetamine Defendants were angling for. The testing of the THCa Diamonds is not included on Defendant Avila's body camera footage at the scene. It is also missing from any other Defendants uploads.

66.    Furthermore, the mathematics of the "5 black marijuana baggies" is incorrect. If the combined weight of the flower and the packaging is 132.6g and the weight of the packaging alone is 2.8g that would make the weight of the flower 129.8. However, Defendant Avila has indicated it is 118.6g. Did he incorrectly weigh something, did something happen to 11.2g of flower, or does he simply not know how to read a scale or do simple mathematics? Again, he is supposed to be the qualified tester on site.

67.    Defendant Lozano who is identified as observing the testing stepped away twice during the testing. Once to speak with a women with his microphone muted and once to speak with a worker from the Fletchers Corny Dog Food Truck who wanted to thank him for removing Mr. Barnett from the area because there are kids around. During the interaction Defendant Lozano accepted his praise and then misstated that the property was private indicating either a fundamental lack of understanding of what is public and what is private or a standing policy of DPD to misrepresent public and private to be able to maintain unearned power and authority. KWP is not private. It is owned by the citizens of the City of Dallas. A Sergeant who is assigned to the area should know this simple fact.

68.    Mr. Barnett was transported to Lew Sterrett Justice Center where he spent the next almost 24 hours before being released on an excessive bond of Two Thousand and no/100 Dollars ($2000) due to Defendants coordinated misstatements about the packaging and the implication of an illicit drug production.

69.    Mr. Barnett's personal and business property was delivered to the DPD Property Unit and logged in by Defendant Brown.

*Post Detention*

70. Mr. Barnett went to the DPD Property Unit to retrieve his cart and other property seized by Defendant Officers. While there he learned that the canned and bottled cannabis drinks he had with him for sale were not included on the inventory being held by the Property Unit. Property advised it is DPD policy to destroy said items. Mr. Barnett was able to secure the cart, assorted plastic containers, and the backpack cooler; however, all inventory was retained by DPD.

71. Defendant Officers did not give Mr. Barnett either written or verbal notice that they would be seizing and destroying his personal and business property. There was no body camera footage of the destruction taking place or accounting of the items supposedly destroyed.

72. City officials and employees did not fairly compensate Mr. Barnett for the seized property.

73. The City's actions deprived Mr. Barnett of valuable property in violation of his Fourth, Fifth, Nineth, and Fourteenth Amendment rights.

74. The City's actions imperiled Mr. Barnett's business and his income.

75. Mr. Barnett made multiple attempts to contact an assigned Narcotics officer. He had hopes that someone who was trained in Narcotics would also be aware of the laws associated with consumable hemp and that due process could move forward quickly. That hope was inaccurate. Narcotics officers were indifferent as they had more important things to do with their time.

76. As a Consumable Hemp Product Licensee Mr. Barnett was very clear that if anything did test positive when tested in a lab following protocols that he would, as required by law, help law enforcement in their investigation of the associated wholesaler he had purchased from. The statutes are clear about how testing is to be done and managed by DSHS and DPS. Again, DPD was indifferent to the statutes even when presented with product that was labeled as authorized by a Consumable Hemp Product License.

77. Mr. Barnett worked with Keena Miller, the District Attorney assigned to the 292nd Judicial District Court in an attempt to get DPD to send some product for testing or simply bring forth their charges so that due process could move forward. Ms. Miller attempted to get information herself related to the case so she could get it on the docket. Her attempts failed.

*May 21, 2024, Grand Jury Downgrade Felony to Misdemeanor*

78. On or about May 21, 2024, the Grand Jury was presented with evidence regarding the marijuana possession. The result was a downgrade from Felony to Misdemeanor charges. This moved the venue of Mr. Barnett's case from the 292nd Judicial Court where Ms. Miller had a grasp of the issues and

statutes involved in DPDs mishandling of a Consumable Hemp Product Licensee and his inventory to Dallas County Criminal Court 7 where Mr. Barnett would most likely have to start the education process all over again in dealing with said Court's assigned District Attorney.

79.   Mr. Barnett was not notified of the Grand Jury proceedings, nor the downgrade and transfer from the 292nd Judicial District Court to Dallas County Criminal Court 7. The district clerk's office for the 292nd Judicial District Court advises it is the responsibility of the receiving court. The district clerk's office for Dallas County Criminal Court 7 advises it is the responsibility of the sending court.

80.   Mr. Barnett learned of the downgrade to the misdemeanor charge when working to counter claims by his estranged wife that he was an active drug user.

*August 13-14, August 30, and September 4, 2024, Divorce, Custody Trial, Loss of Parenting Time*

81.   On or about August 13 and 14, 2024, Plaintiff's estranged wife, Elizabeth Perry Barnett, presented documentation of the arrest of Mr. Barnett and the stated felony charges during their divorce and custody trial. Ms. Barnett continuously referenced the possession charges throughout the proceedings as she laid the false groundwork and asked for, the ability to have Mr. Barnett evaluated, maintain control and testing of compliance for any pharmaceutical prescriptions and therapy her evaluator prescribed, as well as supervised visits with his child until Ms. Barnett felt he was worthy of increased visitation. In the alternative, which was granted, Ms. Barnett asked for a reduction of Mr. Barnett's custody time with their minor child due to her "fear" of Mr. Barnett's "continued" use of illegal marijuana and other drugs in the future. Ms. Barnett was not able to produce any evidence of marijuana or drug use she complained of – only the pending possession charge from 12 months earlier. Mr. Barnett had just learned of the downgrade when he was appearing in Court. The Court considered his testimony of the downgraded charges to be hearsay and Ms. Barnett's attorney was effective in not allowing "new and unreported discovery" into the hearing, blocking Mr. Barnett's ability to show the downgrade.

82.   Mr. Barnett could not rebuke her claims as false as he had not received timely due process nor a day in Court to show that all the inventory seized by Defendant Officers was in fact legal consumable hemp as the packaging indicated.

83.   On or about September 4, 2024, as an appeasement to his estranged wife, the Family Court punished Mr. Barnett for the alleged possession of marijuana by the removal of his "modified expanded possession time" as defined in Texas Family Code Section 153. Mr. Barnett and his child had enjoyed this time since August 27, 2020, when initial temporary orders were issued.

84.  Mr. Barnett was provided with no avenue to reinstate his lost time in the future. Time that, as of September 1, 2021, by legislative action, is no longer considered "expanded" if both parents live within a 50-mile radius of each other, as Mr. Barnett and Ms. Barnett do, but is incorporated into standard possession orders as the default.

85.  Mr. Barnett lost time with his child, damage to his reputation, and his share of any equity in the marital residence because he could not afford the services of an attorney to protect his rights and the rights of his minor child as he was still working to recoup from the financial losses he sustained at the hands of Defendants.

***August 19, 2024, Dismissal of All Charges***

86.  On or about August 19, 2024, the District Attorney of Dallas County, Texas in a *Motion to Dismiss* asked the Court to dismiss the cause (State of Texas vs. Ryan Scott Barnett, Cause No. M2400316) for the following reasons, to wit: "After investigation, it has determined that this case should be dismissed in the interest of justice."

87.  On or about August 19, 2024, Judge Remeko Tranisha Edwards, Presiding Judge, Dallas County Criminal Court 7, Dallas County, Texas, signed an *Order on Motion to Dismiss* granting the motion of the District Attorney of Dallas County, Texas in State of Texas vs. Ryan Scott Barnett, Cause No. M2400316.

88.  Mr. Barnett asked the Court for the return of his property after the dismissal as all the property seized by Defendant Officers was legally saleable product and was intentionally mislabeled as drug evidence by said Defendants.

89.  On or about September 18, 2024, Judge Remeko Tranisha Edwards, Presiding Judge, Dallas County Criminal Court 7, Dallas County, Texas, signed an *Order to Release Property* ordering Defendant City to release "all property, belongings, and merchandise seized during arrest 8/12/2023 for Warrant F235794, including:

- Prerolled joints – multiple varieties
- Gummies – multiple varieties
- Disposable Vaping Devices – multiple varieties
- Vaping Device Cartridges – multiple varieties
- Cannabis Water – canned beverage
- THCa Diamond Powder Substance
- THCa Flower Substance
- Mushroom Gummies
- Menu/Product Listing Pages, Advertising Materials"

*DPD refusal to obey Court Order*

90.  The DPD Property Unit is responsible for receipt and storage of property and evidence (excluding vehicles) retained by Department personnel. It is located at 1725 Baylor Street, Dallas, Texas 75226. The Property Unit page on the DPD website[7] states the following (emphasis and color as displayed):

> "**Property not considered evidence and approved for release by the investigating detective may be released back to the owner.**
>
> The release of general property is restricted to the following times:
>
> **Tuesday – Friday 7 am – 7 pm**
>
> **Saturdays 8 am – 3 pm**
>
> The release of currency, jewelry, and guns is restricted to the following times:
>
> **Tuesday – Friday 8 am – 3 pm**
>
> **THE PROPERTY UNIT IS CLOSED TO THE PUBLIC ON SUNDAYS, MONDAYS, AND HOLIDAYS**"

91.  On or about Tuesday, September 24, 2024, at approximately 1:00 pm, Mr. Barnett went to the DPD Property Unit, located at 1725 Baylor St. Dallas, TX 75226 to retrieve his seized property. He first asked for his property and was told it would take a Court order. Mr. Barnett then responded by showing a Certified copy of the *Order to Release Property* and again asked for its release. DPD Property personnel refused to accept the Order at face value and spent the next 1.5 hours validating its authenticity with the Court. After it was validated as true and accurate, they then refused to obey said Order as it "would require approval up the chain of command – they would be in touch." Mr. Barnett was not sure who "they" would be as that information was not forthcoming. Nor was he sure if "in touch" was to set an appointment for him to return or if it meant "they" would let him know they were not going to obey the direct order of the Court.

92.  Mr. Barnett left in frustration as his Fifth and Fourteenth Constitutional rights to due process were being knowingly trampled by DPD personnel who, clearly, do not have an understanding of Judicial authority or contempt (Texas Supreme Court defined contempt as "disobedience to or disrespect of a court by acting in opposition to its authority"[8]) or the rights of citizens under the U.S. Constitution.

---

[7] https://dallaspolice.net/division/propertyunit/propertyunit
[8] Ex parte Chambers, 898 S.W.2d 257, 259 (1995)

## DAMAGES

93. Each of the aforementioned acts by each Defendant directly and proximately caused Mr. Barnett to suffer the following: violation of civil rights; loss of freedom of expression and loss of enjoyment of freedom of expression; loss of privacy and loss of enjoyment of privacy; loss of personal liberty and freedom to physically move about and loss of enjoyment of personal liberty and freedom to physically move about; financial injury, loss of income, loss of business property; emotional injury, and great and extreme mental anguish; humiliation and defamation of character; and loss of child custody time and loss of the enjoyment of child custody time.

94. Mr. Barnett endures, and continues to endure, a reduction of his custody/parenting time from an almost equal share at 48% down to a mere 25% — a reduction of between 150-188 hours per month — due to each and every act and omission of all Defendants, and each of them.

95. Each of the aforementioned acts by each Defendant directly and proximately caused Mr. Barnett to suffer the following as a result of the loss of custody time: loss of the freedom to walk his child to his classroom when delivering him to school and loss of the enjoyment of walking his child to his classroom and seeing his weekly work posted; loss of the ability to help with homework after school and loss of the enjoyment of helping and participating in the outcome of homework; loss of the ability to pick his child up from school and loss of the enjoyment of picking his child up from school; loss of planning and/or making breakfast and lunches before school and loss of the enjoyment of planning and/or making breakfast and lunches before school; loss of extra-curricular activities (flag football, piano, scouting, …) with his minor child and the loss of the enjoyment of extra-curricular activities; loss of play time, talk time, cuddle time, and quiet time with his child and loss of the enjoyment of play time, talk time, cuddle time, and quiet time with his child.

96. Mr. Barnett endured the loss of 95% of his inventory at the hands of Defendants. To replace the inventory and keep his business open Mr. Barnett had to borrow funds from family and had to use funds that were to be distributed and paid toward his mortgage, child support, everyday living expenses and an attorney to represent him in his ongoing divorce proceeding. Now, twelve months later, his business is just beginning to rebound from the devastation caused by the Defendants unlawful taking of his business property.

97. University Park offers the ability to clear warrants by time served in jail when the time is identified as related to the warrant. Mr. Barnett's hold and time served was not reported by DPD to University Park and therefore Mr. Barnett did not get credit for time served and had to pay an additional $598.00 in bond money. Mr. Barnetts believes and alleges the acts of the Defendants and their use of his

warrant and then to dismissal of its importance shows Defendants were only playing the system and using the warrant as a tool to gain power and to hide the intent to deny Mr. Barnett his Constitutional rights.

98. The normal effect of a dismissal is to leave matters as if charges had never been filed. However, it's not an acquittal or a finding of not guilty, which (through the principle of double jeopardy) prevents further proceedings against Mr. Barnett. Rather, as in this case, when it occurs before trial, dismissal typically leaves the decision of whether to re-prosecute in the hands of the government. If the prosecution decides to bring charges again—Mr. Barnett is on the hook for that possibility until the statute of limitations runs out. He also cannot file for an expungement until the time period runs out. Mr. Barnett fears that if he were to come into the crosshairs of other DPD Officers on a mission to impress or be authoritarian, might use the hanging dismissal in much the same way they used the traffic warrant to unlawfully search and/or seize his property again.

99. An obstacle Mr. Barnett faces in bringing this lawsuit is the degree of "immunity," law enforcement personnel have. Generally speaking, police officers will be immune from suit unless they violate someone's clearly established rights. Mr. Barnett is informed, believes, and thereupon alleges that each of the Defendants–including officials, supervisors, watch commanders, and other policymakers from Defendant City and /or Doe Defendants and their agents have violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights and should lose their qualified immunity so that they can be held accountable for their actions. Mr. Barnett further notes the following arguments/myths related to abolishing or disallowing qualified immunity:

i. Law enforcement officers need the protection of qualified immunity to do their jobs – this is pure myth and simply not true. Qualified immunity only protects government officials who break the law. If officers aren't breaking the law, there is no reason to expect that they will be penalized for their conduct. And, if they are breaking the law, they rightly should have something to worry about.

ii. Law enforcement officers will face bankruptcy without qualified immunity – law enforcement officers are virtually always indemnified — a practice that shields officials from financial liability — regardless of qualified immunity, and rarely pay damages even when found guilty of unconstitutional conduct. Police officers do not pay for the lawyers defending them, either. The city an officer is affiliated with typically pays for police misconduct settlements, using taxpayer money.

## CLAIMS FOR RELIEF

\*\*\*

### FIRST CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Fourth Amendment (Search and Arrest)
### By Plaintiff Against the Officers

100.  Plaintiff incorporates all paragraphs, as though fully set forth herein.

101.  This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Fourth Amendment to the United States Constitution.

102.  The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

103.  Plainly stated, the Fourth Amendment protects Plaintiff from an unreasonable search and seizure.

104.  Defendant's pattern, practice and/or policy of seizing and destroying property constitutes an unreasonable warrantless seizure without probable cause that violates plaintiff's rights under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983.

105.  The unlawful seizure, and detention, of Mr. Barnett: Defendants were without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and were thus unreasonable and in violation of Mr. Barnett's Fourth Amendment rights.

106.  The unlawful seizure, and holding, of Mr. Barnett's business inventory: Defendants were without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and were thus unreasonable and in violation of Mr. Barnett's Fourth Amendment rights.

107.  The unlawful searches of Mr. Barnett, upon his arrest, and separately upon being jailed, were without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto,

or justification or excuse, and were thus unreasonable and in violation of Mr. Barnett's Fourth Amendment rights.

108. The unlawful search of Mr. Barnett's mobile food cart and cooler, upon his arrest, was without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and were thus unreasonable and in violation of Mr. Barnett's Fourth Amendment rights.

109. Mr. Barnett sought the return of his unlawfully seized property from the Court. The Court granted his request. He went to retrieve his property and DPD refused to obey the Court Order demonstrating DPDs continued disdain for the due process clause and protection of Mr. Barnett's Fourth Amendment rights.

110. Unless restrained by this Court, Defendants will continue to engage in the unconstitutional and illegal conduct alleged herein, or other similar unconstitutional or illegal conduct, causing irreparable harm to the people of Dallas and the State of Texas.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**Sixth Amendment (Right to a Fair Trial)**

**By Plaintiff Against the Officers**

111. Plaintiff incorporates all paragraphs, as though fully set forth herein.

112. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Sixth Amendment to the United States Constitution.

113. The Sixth Amendment states that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

114. Simply put, the Sixth Amendment guarantees Plaintiff's right to a fair trial and speedy trial.

115. Application and Scope: Because the guarantee of a speedy trial "is one of the most basic rights preserved by our Constitution," it is one of those "fundamental" liberties embodied in the Bill of Rights which the due process clause of the Fourteenth Amendment makes applicable to the States.[9] The protection afforded by this guarantee "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." Invocation of the right need not await indictment, information, or other formal charge but begins with the actual restraints imposed by arrest if those restraints precede the formal preferring of charges.[10]

---

[9] Klopfer v. North Carolina, 386 U.S. 213, 226 (1967)

[10] United States v. Marion, 404 U.S. 307, 313, 320, 322 (1971). Justices Douglas, Brennan, and Marshall disagreed, arguing that the ``right to a speedy trial is the right to be brought to trial speedily which would seem to be as relevant to pretrial indictment delays as it is to post-indictment delays,'' but concurring because they did not think the guarantee violated under the facts of the case. Id. at 328. In United States v. MacDonald, 456 U.S. 1 (1982), the Court held the clause was not implicated by the action of the United States when, in May of 1970, it proceeded with a charge of murder against defendant under military law but dismissed the charge in October of that year, and he was discharged in December. In June of 1972, the investigation was reopened and an investigation was begun, but a grand jury was not convened until August of 1974, and MacDonald was not indicted until January of 1975. The period between dismissal of the first charge and the later indictment had none of the characteristics which called for application of the speedy trial clause. The period between arrest and indictment must be considered in evaluating a speedy trial claim. Marion and MacDonald were applied in United States v. Loud Hawk, 474 U.S. 302 (1986), holding the speedy trial guarantee inapplicable to the period during which the government appealed dismissal of an indictment, since during that time the suspect had not been subject to bail or otherwise restrained.

116. When the right is denied: "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."[11] No length of time is per se too long to pass scrutiny under this guarantee,[12] but on the other hand neither does the defendant have to show actual prejudice by delay.[13] The Court rather has adopted an ad hoc balancing approach. "We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."[14] The fact of delay triggers an inquiry and is dependent on the circumstances of the case. Reasons for delay will vary. A deliberate delay for advantage will weigh heavily, whereas the absence of a witness would justify an appropriate delay, and such factors as crowded dockets and negligence will fall between these other factors.[15] It is the duty of the prosecution to bring a defendant to trial, and the failure of the defendant to demand the right is not to be construed as a waiver of the right;[16] yet, the defendant's acquiescence in delay when it works to his advantage should be considered against his later assertion that he was denied the guarantee, and the defendant's responsibility for the delay would be conclusive. Finally, a court should look to the possible prejudices and disadvantages suffered by a defendant during a delay.[17]

117. The constitutional right to be informed of the nature and cause of the accusation entitles the defendant to insist that the indictment apprise him of the crime charged with such reasonable certainty that he

---

[11] Beavers v. Haubert, 198 U.S. 77, 87 (1905) (holding that the guarantee could not be invoked by a defendant first indicted in one district to prevent removal to another district where he had also been indicted)

[12] Pollard v. United States, 352 U.S. 354 (1957); United States v. Ewell, 383 U.S. 116 (1966). See United States v. Provoo, 350 U.S. 857 (1955), aff'g 17 F.R.D. 183 (D. Md. 1955)

[13] United States v. Marion, 404 U.S. 307, 320 (1971); Barker v. Wingo, 407 U.S. 514, 536 (1972) (Justice White concurring).

[14] Barker v. Wingo, 407 U.S. 514, 530 (1972). For the federal courts, Congress under the Speedy Trial Act of 1974 imposed strict time deadlines, replacing the Barker factors.

[15] Barker v. Wingo, 407 U.S. 514, 531 (1972). Delays caused by the prosecution's interlocutory appeal will be judged by the Barker factors, of which the second–the reason for the appeal–is the most important. United States v. Loud Hawk, 474 U.S. 302 (1986) (no denial of speedy trial, since prosecution's position on appeal was strong, and there was no showing of bad faith or dilatory purpose). If the interlocutory appeal is taken by the defendant, he must "bear the heavy burden of showing an unreasonable delay caused by the prosecution [or] wholly unjustifiable delay by the appellate court" in order to win dismissal on speedy trial grounds. Id. at 316.

[16] Id. at 528. See generally id. at 523±29. Waiver is ``an intentional relinquishment or abandonment of a known right or privilege," Johnson v. Zerbst, 304 U.S. 458, 464 (1938), and it is not to be presumed but must appear from the record to have been intelligently and understandingly made. Carnley v. Cochran, 369 U.S. 506, 516 (1962).

[17] Barker v. Wingo, 407 U.S. 514, 532 (1972).

can make his defense and protect himself after judgment against another prosecution on the same charge.[18]

118. Mr. Barnett attempted on multiple occasions to move the case toward trial; however, the indifference and refusal of Defendants Does to complete their investigation and forward to the prosecution caused a delay of months. During this time Mr. Barnett was also unable to assert a full defense as he was unaware of the exact charges that were being issued and he was blocked from retrieving discovery and obtaining witnesses on his behalf.

119. Mr. Barnett was then denied a public trial where he could clear his name and the reputation of his business because the prosecution realized that the case against Mr. Barnett was invalid. They cut their losses by simply moving to have all charges dropped.

120. The charges; however, stay on Mr. Barnett's record and will continue to plague his reputation. His estranged wife can continue to make claims against him. She can craft the narrative to say he was not found "not guilty", they just didn't have enough evidence to go through with the trial.

121. By statute, he will be required to wait five years to ask to have the charges expunged and then will incur attorney fees and filing fees as the expungement filings and hearings are not included in his right to counsel. Defendants' actions are the direct and proximate cause of this continued damage to Mr. Barnett.

---

[18] United States v. Cruikshank, 92 U.S. 542, 544, 558 (1876); United States v. Simmons, 96 U.S. 360 (1878); Bartell v. United States, 227 U.S. 427 (1913); Burton v. United States, 202 U.S. 344 (1906).

### THIRD CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
**Fourteenth Amendment (Malicious Prosecution / Substantive Due Process)**
**By Plaintiff Against the Officers**

122. Plaintiff incorporates all paragraphs, as though fully set forth herein.

123. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Fourteenth Amendment to the United States Constitution.

124. The Fourteenth Amendment guarantees Plaintiff's substantive due process of law.

125. Mr. Barnett sought the return of his unlawfully seized property from the Court. The Court granted his request. He went to retrieve his property and DPD refused to obey the Court Order demonstrating DPDs continued disdain for the due process clause and protection of Mr. Barnett's Fourteenth Amendment rights.

126. The acts of Defendants were retaliatory, fraudulent, deliberate, and in contemplation of intimidating Mr. Barnett. The Deputies acted with malice and oppression. Mr. Barnett was detained, arrested, jailed and maliciously prosecuted based upon a fabricated police report, prepared by government agents, under the guise of their sworn duty as officers of the law.

127. Defendant's pattern, practice and/or policy of seizing and destroying property constitutes an unreasonable warrantless seizure without probable cause that violates plaintiff's rights under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983.

128. Defendant's pattern, practice and/or policy of seizing and destroying property without reasonable notice, an opportunity to contest the seizure and an opportunity to retrieve the property constitutes a deprivation of property without due process of law, which violates plaintiffs' procedural due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

129. Defendant's pattern, practice and/or policy of seizing and destroying property without just compensation constitutes a taking of private property for public use, which violates plaintiffs' rights under the takings clause of the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### Eighth Amendment (Bail, Fines, and Punishment)

### By Plaintiff Against the Officers

130. Plaintiff incorporates all paragraphs, as though fully set forth herein.

131. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Sixth Amendment to the United States Constitution.

132. The Eighth Amendment guarantees Plaintiff's freedom from excessive bail.

133. The acts of Defendants including their omission of details led to an excessive bail being placed on Mr. Barnett. Not only had he lost his entire business inventory, but instead of receiving a recognizance bond as a business owner with no reason to be a flight risk should have received, he was required to pay a high $2000.00 bond that was then held for over twelve months by the Dallas County District Clerk. Funds that he could have used to purchase replacement inventory. Funds that he could have used to pay his mortgage or many other responsibilities. Funds that could have been used for child support. Funds that could have been used for an attorney to represent Mr. Barnett's interest in his divorce.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**Fifth Amendment (Takings )**

**By Plaintiff Against the Officers**

134. Plaintiff incorporates all paragraphs, as though fully set forth herein.

135. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Fifth Amendment to the United States Constitution.

136. The Fifth Amendment guarantees Plaintiff he will not be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

137. Defendant's pattern, practice and/or policy of seizing and destroying property without just compensation constitutes a taking of private property for public use, which violates plaintiffs' rights under the takings clause of the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. §§ 1983, 1988)
### Conspiracy to Violate Civil Rights
### By Plaintiff Against the Officers

138. Plaintiff incorporates all paragraphs, as though fully set forth herein.

139. This cause of action arises under 42 U.S.C. §§ 1983 and 1988, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

140. Defendants, and each of them, acted as described herein above, in conspiracy with, and with the agreement, permission, ratification, and approval of, each other to violate Mr. Barnett's civil rights afforded under the United States Constitution.

141. Among other things, the Deputies acted in conspiracy and with agreement, permission, ratification, and approval of their joint conduct to (1) unlawfully detain Mr. Barnett without probable cause or reasonable suspicion; (2) unlawfully conduct a detention of Mr. Barnett without probable cause or reasonable suspicion; (3) unlawfully search Mr. Barnett without probable cause or reasonable suspicion; (4) unlawfully take property of Mr. Barnett without probable cause or reasonable suspicion; (5) unlawfully destroy property of Mr. Barnett without probable cause or reasonable suspicion; (6) unlawfully trespass Mr. Barnett from the right-of-way of a public street and bridge; and to (7) collaborate to fabricate and advance false police reports resulting in the jailing of Mr. Barnett.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. §§ 1983, 1988)
### Unconstitutional Policy, Custom, or Procedure (*Monell*)
### By Plaintiff Against Defendant City

142. Plaintiff incorporates all paragraphs, as though fully set forth herein.

143. This cause of action arises under 42 U.S.C. §§ 1983 and 1988, wherein Plaintiff seeks to redress the deprivation under color of law of a right, privilege, or immunity secured to him by the he First, Fourth, and Fourteenth Amendments to the United States Constitution.

144. Defendant Garcia and City violated Mr. Barnett's constitutional rights, as alleged above, by creating and maintaining the following unconstitutional customs and practices, among other things:

  i.   Mr. Barnett is informed, believes, and thereupon alleges that Defendants Garcia and City have ample reason to know, based upon arrest reports, claims for damages, among other things, that DPD officers and/or employees regularly engage in the misdeeds set forth in this entire complaint;

  ii.  Mr. Barnett is informed, believes, and thereupon alleges that Defendants Garcia and City have failed to properly train, supervise, and/or discipline employees, officers, managers, and supervisors within the DPD as to the legal requirements and protections applicable to persons as set forth in the: United States Constitution, and other laws; and

  iii. Mr. Barnett alleges that these failures amount to a de facto policy and are intentional and/or the result of deliberate indifference on the part of Defendants Garcia and City, by and through its decision makers. These include, but are not limited to, Defendant Garcia and his subordinates, as necessary to further these improper policies, practices, customs, and procedures.

145. The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Mr. Barnett.

146. Defendants Garcia, Herrera, and Lozano acted in a supervisory capacity with respect to the incidents involving Mr. Barnett. In that capacity, Defendants Garcia, Herrera, and Lozano acted intentionally, maliciously, in conscious disregard, and/or with deliberate indifference to the rights of Mr. Barnett. Mr. Barnett is informed, believes, and thereupon alleges that Defendants Garcia, Herrera, and Lozano acted in this manner, at least in part, to avoid liability and financial exposure for the DPD and to maintain their reputations and the reputation of the DPD.

147. These supervisory failures of Defendants Garcia, Herrera, and Lozano directly caused and contributed to Plaintiff's damages.

148. Plaintiff specifically alleges that Defendants Garcia, Herrera, and Lozano and City's policy, custom, and practice, as described *supra*, was within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff.

## NATURE OF ALL DEFENDANTS ACTIONS

149. Defendants acted maliciously and oppressively in violating Mr. Barnett's clearly established rights under United States and Texas law by threats, intimidation, and/or coercion.

150. As a result of Defendants' unlawful conduct as alleged herein, Mr. Barnett: suffered, and will continue to suffer, the above stated damages in an amount according to proof, including attorney fees and costs, to remedy the unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Barnett prays for the following relief from Defendants, and each of them, for each of the above causes of action:

151. Declare that the City's pattern, practice and/or policy violates plaintiffs' Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

152. Issue preliminary and permanent injunctive relief enjoining the Defendant City, its officials, officers, employees, agents, assigns, and those acting in concert with it, from conducting any detentions or property sweeps of vendor's property until adequate policies are promulgated to protect and safeguard plaintiff's Fourth Fifth, Sixth, Eighth, and Fourteenth Amendment right.

153. Issue preliminary and permanent injunctive relief enjoining the Defendant City, its officials, officers, employees, agents, assigns, and those acting in concert with it, from seizing and/or testing products labeled under the statutory guidelines of the Consumable Hemp Products Licensed program and authority of the Texas Department of Health and Human Services.

154. Order that the dismissal of charges for his arrest be modified to include "with prejudice" to ensure Defendant City, its officials, officers, employees, agents, assigns, and those acting in concert with it is not able to act in bad faith or retaliation against Mr. Barnett.

155. Order the expungement of all charges from Mr. Barnett's record.

156. Award Mr. Barnett:

    i.    For compensatory damages, including general and special damages, according to proof;

    ii.    For punitive damages pursuant to 42 U.S.C. §1983, and any other applicable laws or statutes, in an amount sufficient to deter and make an example of each entity Defendant;

    iii.    For statutory damages, according to proof;

    iv.    For prejudgment interest according to proof;

    v.    For reasonable attorney fees pursuant to 42 U.S.C. §§ 1983, 1988; and any other applicable provisions;

    vi.    For costs of suit; and

    vii.    For such further relief which is just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury in this action.

Dated: September 25, 2024.        Respectfully submitted,

*Ryan Barnett*

Ryan Scott Barnett

Attorney *Pro Se*
214-707-6986
ryansbarnett@gmail.com
10785 Coogan Drive
Dallas, Texas 75229